[Cite as *In re C.W.*, 2024-Ohio-3366.]

# IN THE COURT OF APPEALS OF OHIO
# THIRD APPELLATE DISTRICT
# HANCOCK COUNTY

IN RE:

    C.W.,

ABUSED, NEGLECTED AND
DEPENDENT CHILD.

[HEATHER H. - APPELLANT]

CASE NO. 5-23-51

**O P I N I O N**

Appeal from Hancock County Common Pleas Court
Juvenile Division
Trial Court No. 2021 AND 0029

**Judgment Affirmed**

**Date of Decision: September 3, 2024**

APPEARANCES:

    *Howard A. Elliott* **for Appellant**

    *Emil G. Gravelle* **and** *Justin Kahle* **for Appellee**

**WALDICK, J.**

{¶1} Mother-appellant, Heather H. ("Mother"), brings this appeal from the December 4, 2023 judgment of the Hancock County Common Pleas Court, Juvenile Division, granting permanent custody of C.W. to the Hancock County Job and Family Services, Children's Protective Services Unit ("CPSU"). On appeal, Mother argues that the trial court erred by determining that CPSU engaged in reasonable efforts to support reunification in this matter, and she contends that she received ineffective assistance of counsel. For the reasons that follow, we affirm the judgment of the trial court.

*Background*

{¶2} C.W. was born in November of 2021. Her parents are Mother and Nicholas W. According to hospital records, C.W. had a normal birth.

{¶3} On December 23, 2021, CPSU filed a complaint alleging that C.W. was an abused, neglected, and dependent child. At only five weeks old, C.W. had sustained five fractures in different stages of healing. The fractures included two "recent corner fractures to her right femur, and one old fracture to her left tibia that had already been healed."[1] (Dec. 27, 2021, Tr. at 10). There was also bruising on both of C.W.'s legs, including what looked like handprints.[2] A physician/expert in

[1] A "corner fracture" was described as "an injury that takes place with a twisting or yanking motion of a limb." (*Id.*)
[2] At the hospital, nurses observed Nicholas W. being "very aggressive with the baby, forcefully pushing her arms to the bed, forcefully pushing her arms into blankets * * * so hospital staff [stepped] in." (Tr. at 12).

child abuse indicated that the injuries to C.W. were not accidental and he opined that the injuries were from child abuse. Both parents claimed they believed the injuries resulted from childbirth, but the physician ruled-out that possibility. Both parents also indicated that no one else other than them had unsupervised access to C.W.[3]

{¶4} On March 1, 2022, by agreement of the parties, C.W. was adjudicated an abused, neglected, and dependent child. The parties also agreed that C.W. would continue in the temporary custody of CPSU.

{¶5} As the case proceeded, Mother worked on the established case plan, but Nicholas did not. Mother engaged in supervised visitation with C.W. for one hour each week. Eventually the visitation was increased to two hours each week; however, Mother never progressed to unsupervised visitation. Notably, Mother continued to maintain to caseworkers and to a forensic psychologist that C.W.'s injuries came from her birth, despite the evidence to the contrary.

{¶6} When Mother was evaluated by the forensic psychologist it was determined that she was presenting as someone "who is faking-good, that is, denying common problems that most people readily endorse. Hers is an extreme example of virtuous self-presentation, that of a person who describes herself as

---

[3] The injuries to C.W. were being criminally investigated while this case was proceeding; however, no charges had been filed at the time this case concluded.

remarkably well-adjusted psychologically, unlikely in the general population she is compared to." (CPSU Ex. 18).

**{¶7}** The psychologist also found Mother's insistence that C.W.'s injuries were from birth troubling, stating:

> I have real concerns about her ability to successfully parent a child and to be a good enough parent to a child, based on her lack of accountability for what happened with her daughter. There is really two issues. One, the child was severely injured, and she didn't know about it. That's a problem. The child was severely injured, she knew about it, and did nothing about it. That's also a problem. They're different kind of problems, but they both kind of indicate that something is really missing, and it would be very, very difficult to, you know, in my opinion anyway, for me to recommend return of a child to a family that had been found to have committed abuse and accepted no responsibility, or couldn't describe how the injuries might have happened, which is not really rational or logical.

(Dec. 1, 2023, Tr. at 257).

**{¶8}** In June of 2023, CPSU filed a motion for permanent custody of C.W. After CPSU filed the motion, Nicholas consented to the motion, stating that he believed that permanent custody best served the safety and stability of C.W.[4] Mother opposed the permanent custody motion, and the matter proceeded to a final hearing on November 13-14, 2023, and December 1, 2023.

**{¶9}** At the final hearing, CPSU presented the testimony of numerous witnesses who indicated that C.W. was thriving in her placement. Testimony

---

[4] Nicholas had not complied with any of the case plan up to that point. He was actually held in contempt for failing to comply with orders such as getting a DNA test.

indicated that Mother had completed portions of the case plan but she had failed to apply what she learned in classes. She also did not complete her therapy. In addition, testimony indicated that Mother repeatedly refused to acknowledge that any abuse had happened to C.W. for the two years the case had been pending, maintaining that the various injuries were all from child birth.

{¶10} However, when Mother testified at the final hearing, for the first time she claimed that C.W.'s injuries must have been caused by Nicholas. Nevertheless, at the same time Mother also argued that C.W.'s birth records had been falsified and C.W. must have been injured at birth.

{¶11} The GAL that was involved in the case, the forensic psychologist, and the various caseworkers all recommended that CPSU's permanent custody motion be granted.

{¶12} At the conclusion of the hearing, the trial court took the matter under advisement, then promptly issued a final judgment entry on December 4, 2023. In its entry, the trial court analyzed the evidence presented and ultimately granted CPSU's motion for permanent custody of C.W. It is from this judgment that Mother now appeals, asserting the following assignments of error for our review.

**First Assignment of Error**

**The Appellant/Mother was prejudiced by the Agency's failure to use reasonable efforts to reunite the mother with her child, requiring the permanency order to be vacated.**

**Second Assignment of Error**

**The Appellant/Mother was prejudiced by ineffective assistance of trial counsel which resulted in the granting of the motion for permanent custody and without it would have lead the trial court to a different conclusion and the permanency order must be set aside.**

*First Assignment of Error*

{¶13} In her first assignment of error, Mother argues that the trial court erred by determining that CPSU engaged in reasonable efforts to reunite her with C.W.

Relevant Authority

{¶14} "[V]arious sections of the Revised Code refer to the agency's duty to make reasonable efforts to preserve or reunify the family unit," most notably R.C. 2151.419. *In re C.F.*, 2007-Ohio-1104, ¶ 29. Revised Code 2151.419(A)(1) requires a trial court to determine whether a children services agency "made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." However, this statute applies only at "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children[.]" *In re C.F.* at ¶ 41; *accord In re R.R.*, 2021-Ohio-1620, ¶ 78 (3d Dist.).

{¶15} Notably, the Supreme Court of Ohio concluded that " '[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant

to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414.' " *In re C.F.* at ¶ 41, quoting *In re A.C.*, 2004-Ohio-5531, ¶ 30 (12th Dist.). Nonetheless, "[t]his does not mean that the agency is relieved of the duty to make reasonable efforts" before seeking permanent custody." *Id.* at ¶ 42. "[If] the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* at ¶ 43.

{¶16} In *In re R.R.*, 2021-Ohio-1620, ¶ 79 (3d Dist.), this Court applied the Supreme Court of Ohio's holding in *In re C.F.* and determined that because the trial court previously made reasonable-efforts findings, the agency was not required to prove, nor was the trial court required to find, that the agency used reasonable efforts to reunify a mother with her child before the trial court could grant permanent custody of the child to the agency.

Analysis

{¶17} Although Mother argues that the trial court erred by finding in its final judgment entry that CPSU engaged in reasonable efforts to support reunification in this case, the trial court had previously determined that CPSU engaged in reasonable efforts to reunify the family at multiple earlier points during the case. Generally, a children's services agency is required to demonstrate reasonable efforts prior to

filing a permanent custody motion[5], not at the permanent custody hearing, *unless it has failed to do so previously. In re I.C.*, 2023-Ohio-4707, ¶ 58 (3d Dist.), citing *In re S.S.*, 2017-Ohio-2938, ¶ 166-169 (4th Dist.). "Because the trial court entered a reasonable efforts finding before placing the children in the agency's permanent custody," it was not required to do so again. *See id.*

{¶18} Nevertheless, in the interests of justice we will review Mother's assignment of error. In its final entry, the trial court stated as follows when determining reasonable efforts had been made by CPSU to support reunification:

> The Court further finds that reasonable efforts have been made by CPSU in that the following services have been made to the parents including a search for relatives, case plan services, parent education, mental health and substance abuse referrals, domestic violence counseling, and a psychological assessment. The Court finds further that reasonable efforts to finalize a permanency plan have been made by CPSU in that they have conducted a search for relatives and have filed for permanent custody.

(Doc. No. 98).

{¶19} The trial court's findings are directly supported by the evidence and the testimony of numerous witnesses including caseworkers, the GAL, and a forensic psychologist. Mother attempts to undermine the trial court's findings by arguing that she never progressed to unsupervised visitation in this case, which she characterizes as a failure on the part of CPSU. However, it was explained that a

---

[5] *See* R.C. 2151.414(B)(1)(d).

criminal investigation was ongoing as to whether Mother or Nicholas was the perpetrator of C.W.'s injuries. Since Mother refused to accept, until possibly the final hearing date, that C.W. was the victim of abuse *at all*, and since Mother was under investigation, nobody involved in the case believed that Mother should have unsupervised visitation because C.W. was potentially in danger. We find no error on this issue.

**{¶20}** Mother also contends that she came to the realization that Nicholas must have caused the injuries to C.W. approximately six months prior to the final hearing, thus CPSU should have increased visitation. However, this is contrary to Mother's statements to caseworkers, the GAL, and the forensic psychologist. Further, even at the final hearing when Mother changed her story, she still placed blame on "falsified" birth records.

**{¶21}** Simply put, Mother failed to take any responsibility for the injuries to C.W., and she failed to recognize that even if she did not injure C.W., she failed to protect C.W. from *repeated* injuries that occurred in the first five weeks of C.W.'s life. Then, she showed further poor judgment by denying the medical evidence that contradicted her birth-injury theory.

**{¶22}** Although Mother blames CPSU for failing to engage in "reasonable efforts," it is largely Mother's own actions that resulted in a failed reunification. *In re S.P.*, 2022-Ohio-576, ¶ 40 (3d Dist.). When considering reasonable efforts, the

issue is not whether there was anything more that CPSU could have done, but whether the case planning and efforts were reasonable and diligent under the circumstances of this case. *In re Leveck,* 2003-Ohio-1269, ¶ 10 (3d Dist.). There is no indication that there is anything more that CPSU could have done to assist Mother in this matter, particularly given her attitude toward C.W.'s injuries. For all of these reasons, Mother's first assignment of error is overruled.

*Second Assignment of Error*

**{¶23}** In her second assignment of error, Mother argues that she received ineffective assistance of trial counsel.

Standard of Review

**{¶24}** In permanent custody matters, we apply the same test for ineffective assistance of counsel that we do in criminal cases. *In re A.D.*, 2023-Ohio-2442, ¶ 22. To establish ineffective assistance of counsel, the represented party must demonstrate: (1) deficient performance by counsel, i.e., that counsel's performance fell below an objective standard of reasonable representation, and (2) that counsel's errors prejudiced the party, i.e., a reasonable probability that but for counsel's errors, the outcome would have been different. *Id*. at ¶ 23, citing *Strickland v. Washington*, 466 U.S. 668, 669, 694.

Analysis

**{¶25}** Mother contends that her trial counsel was ineffective for failing to call the former CASA/GAL in this case to testify that Nicholas purportedly confessed to causing the injuries to C.W. Her argument fails for multiple reasons.

**{¶26}** First, we have no evidence in the record that Nicholas actually confessed to the former GAL. Since we do not know that the purported testimony would have been elicited even if trial counsel had called the former CASA/GAL to testify, this claim cannot form the basis for ineffective assistance of counsel. "In other words, [s]he would need to supply proof outside the record, which this court cannot consider on direct appeal." *State v. Kirkland*, 2014-Ohio-1966, ¶ 76.

**{¶27}** Second, even if the witness had been called and indicated that Nicholas confessed, there is no indication that the outcome of the proceedings would have been different. In fact, a confession from Nicholas would make Mother's assertions throughout the case that the injuries to C.W. had to have occurred at birth even more absurd.

**{¶28}** In sum, we do not find either deficient performance from trial counsel or that any alleged failures of trial counsel resulted in any prejudice. Mother is thus unable to establish either prong of ineffective assistance of counsel. Therefore, her second assignment of error is overruled.

*Conclusion*

**{¶29}** Having found no error prejudicial to Mother in the particulars assigned and argued, her assignments of error are overruled and the judgment of the Hancock County Common Pleas Court, Juvenile Division, is affirmed.

***Judgment Affirmed***

**ZIMMERMAN, J., concur.**

**WILLIAMOWSKI, P.J., concurs in judgment only.**

**/jlm**