[Cite as *1-25-15, 16, 20*, 2026-Ohio-403.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

**IN RE:**

    **P.S.,**

**ADJUDICATED DEPENDENT
CHILD.**

**[MICHAEL S. - APPELLANT]
[TINA B. - APPELLANT]**

**CASE NO. 1-25-15**

**OPINION AND
JUDGMENT ENTRY**

---

**IN RE:**

    **M.S.,**

**ADJUDICATED DEPENDENT
CHILD.**

**[MICHAEL S. - APPELLANT]
[TINA B. - APPELLANT]**

**CASE NO. 1-25-16**

**OPINION AND
JUDGMENT ENTRY**

---

**IN RE:**

    **R.B.,**

**ADJUDICATED DEPENDENT
CHILD.**

**[TINA B. - APPELLANT]**

**CASE NO. 1-25-20**

**OPINION AND
JUDGMENT ENTRY**

**Appeals from Allen County Common Pleas Court
Juvenile Division
Trial Court Nos. 2023 JG 38571, 2023 JG 38892 and 2023 JG 38573**

**Judgments Affirmed**

**Date of Decision: February 9, 2026**

**APPEARANCES:**

> *Howard A. Elliot* **for Appellant Michael S.**
> *Michael G. Aird* **for Appellant Tina B.**
> *Ashley Stansbury and John Willamowski, Jr.* **for Appellee**

**WALDICK, J.**

{¶1} Mother-appellant, Tina B. ("Mother"), brings these appeals from the April 22, 2025 judgments of the Allen County Common Pleas Court, Juvenile Division, granting permanent custody of her three children, P.S., R.B., and M.S., to the Allen County Children's Services Board ("the Agency"). Father-appellant, Michael S. ("Father"), also appeals the trial court's judgments to grant permanent custody of his two children that he shares with Mother, P.S. and M.S., to the Agency. For the reasons that follow, we affirm the judgment of the trial court.

*Background*

{¶2} Mother has three children that are the subjects of this action: R.B., born in February of 2016; P.S., born in March of 2017; and M.S., born in September of 2023. The biological father of P.S. and M.S. is Father. The biological father of R.B. is a man named Edward P., who was not involved in his child's case despite being on notice of the proceedings.[1]

{¶3} Prior to the inception of the instant cases, Mother and Father lived in Kentucky. It is undisputed that a Kentucky children's services agency removed R.B. and P.S. from the care of Mother and Father due to poor home conditions for approximately three years, but the children were ultimately returned to Mother and Father in 2022.

{¶4} In late 2022, Mother and Father were residing in a home owned by Father on Holly Street in Lima, Ohio. In December of 2022, the Agency received reports concerning the home conditions at Mother and Father's residence and investigated the matter. An Agency investigator visited the Holly Street home and found that the conditions were "deplorable."

{¶5} The home was *extremely* cluttered with trash, items, dirt, and debris creating fire hazards and making it difficult for children to move around. Feces was found on the floor of living areas including on beds and in the bedrooms where the

---

[1] At one point while the cases were pending, Edward P. was living with Mother and Father.

children slept. There was a hole in the bathroom wall where cats came and went from the residence to the outside. An Agency investigator indicated there were so many cats she could not count them. Litter boxes were described as "overflowing." Mother and Father's kitchen was "filthy" and they had little food. There were locks on the refrigerator so the children could not eat late at night. There were other issues with the toilet and bathroom sink. The children's windows were screwed shut adding to the fire hazards.

{¶6} In addition to the conditions of the residence itself, the children were unkempt with poor hygiene and dirty clothes. The children regularly had issues with head lice. The Agency investigator did not observe any toothbrushes or hairbrushes in the residence.

{¶7} Furthermore, indicative of problems that would continue during the pendency of these cases, there were numerous other individuals residing in the residence with Mother and Father. For instance, Father's wife was living in the residence, along with a woman named Sharon. Another woman who was largely bedridden named Louise lived in the residence. There were two other (older) children in the residence in addition to R.B. and P.S.

{¶8} Father and Mother were not married to each other; rather, they maintained a polyamorous relationship with each other and with some of the people in the residence. The record indicates that although Father was married to another woman, he was "engaged" to multiple other women.

{¶9} On March 14, 2023, complaints were filed alleging that P.S. and R.B. were dependent children. A GAL was appointed for the children.

{¶10} At the scheduled adjudication hearing, Mother and Father ultimately admitted that the children were dependent. At the dispositional hearing, the Agency was given protective supervision of the children but the children remained in the custody of Mother.

{¶11} Over the ensuing months, the Agency assisted Mother and Father with efforts to improve their home conditions. The Agency provided multiple dumpsters for Mother and Father to remove trash and debris from the residence. The Agency provided the family with vouchers for cleaning supplies and assisted with fixing issues in the home. In addition, the Agency provided the family with a weekend hotel stay in order to get the family out of the house to make it easier to clean. Assistance was also provided for food and utility bills. The Agency provided a bunkbed for the children and, *inter alia*, toothbrushes for the children.

{¶12} The cases were set for a "review hearing" on August 10, 2023; however, upon learning that the conditions in the residence had not improved significantly despite all of the Agency's intervention, the hearing was converted to a shelter-care hearing. It was noted that the children were again dirty with matted hair when an Agency caseworker visited the home. Further, the Agency caseworker stepped in a puddle of urine during the home visit. The home itself was again very

unclean with more feces and spoiled food. Father blamed the failure to clean on the children.

**{¶13}** In addition to the home conditions, Mother and Father had not scheduled medical appointments for the children. The children needed to see a dentist and have physicals, but Mother and Father provided thin excuses as to why the appointments had not been scheduled. Father also had multiple positive drug tests for cocaine. Furthermore, Mother and Father had allowed a man who had multiple substantiated allegations of sexual abuse to stay in the home and even sleep near the children without informing the Agency. Ultimately, as a result of the conditions, the children were removed from the care and custody of their parents and placed in the temporary custody of the Agency.

**{¶14}** M.S. was born in September of 2023, a little over a month after P.S. and R.B. were placed in the temporary custody of the Agency. As a result of the Agency already being involved with the family, a complaint was filed on September 20, 2023, alleging that the newborn M.S. was a dependent child. Mother and Father admitted that M.S. was a dependent child and she was placed in the temporary custody of the Agency.

**{¶15}** As the cases proceeded, Mother and Father engaged with the case plan to varying degrees. They were granted supervised visitation with the children, but only attended approximately one-third of those visitations. Mother and Father never proceeded beyond supervised visitations. In fact, Father often left early from the

visitations to "warm up" the vehicle or handle other "business." Moreover, although the children would attend visitation with the parents lice-free, there were incidents where they left visitations with lice.

{¶16} While the cases were pending, there were a number of individuals who came to stay at the residence with Mother and Father for periods of time. The Agency indicated that Mother and Father did not consistently report the individuals staying in their home despite it being a requirement of the case plan. For example, names of individuals who spent nights at Mother and Father's residence included Jennifer, Louise, Sharon, Kayla, Edward, Mark, Bonnie, Jaquell, and Shawn. Numerous issues arose in the residence involving these individuals, some involving law enforcement. In addition, several of the individuals, such as Kayla and Jaquell, had lost custody of their children through court orders.

{¶17} Father eventually sold the house on Holly Street in Lima because he could not make all the necessary repairs. After the house was sold, Mother rented a house nearby and secured a lease with a woman who had lost permanent custody of her children. Father was not on the lease.

{¶18} On August 14, 2024, the Agency filed motions for permanent custody of the three children. A final hearing was held on the Agency's motions March 3, 2025, and April 8, 2025. Notably, the GAL supported the Agency's motion for permanent custody of the children. When the hearing concluded, the trial court took the matter under advisement.

{¶19} On April 22, 2025, the trial court issued lengthy final judgment entries in all three cases granting the Agency permanent custody of all three children. Mother and Father each individually appeal the trial court's judgments. Mother asserts the following assignments of error for our review.

### Mother's First Assignment of Error

**The trial court erred by failing to apply and enforce R.C. 2151.281(D) and (I) regarding the Guardian Ad Litem and considering the GAL's report in its ruling.**

### Mother's Second Assignment of Error

**The trial court's decision to grant the Agency's motion for permanent custody was against the manifest weight of the evidence.**

### Mother's Third Assignment of Error

**The trial court erred in denying Appellant's objection to Motion for Permanent Custody and Request for Extension.**

### Mother's Fourth Assignment of Error

**Appellant received ineffective assistance of counsel when counsel failed to object to the admission of the Guardian Ad Litem report.**

### Mother's Fifth Assignment of Error

**The trial court erred when it failed to grant the continuance requested on the first day of the hearing on the motion for permanent custody.**

{¶20} Father asserts the following assignments of error for our review.

**Father's First Assignment of Error**

**The agency failed to put forth reasonable efforts for reunification of the parents with the children despite the compliance of the parents with the case plan. The agency's plan seemed to exclude them and seek permanent custody of the children all of which was error.**

**Father's Second Assignment of Error**

**The trial court erred in allowing inadmissible evidence to be admitted and subsequently violating the Appellant father's right of confrontation and cross-examination of the evidence and witness against him and for those reasons the matter must be reversed and remanded to the trial court for further proceedings.**

{¶21} For ease of discussion, we elect to address some of the assignments of error together, and out of the order in which they were raised.

*Mother's Second Assignment of Error*; *Mother's Third Assignment of Error*

{¶22} In Mother's second assignment of error, she argues that the trial court's decision to grant permanent custody of the three children to the Agency was against the manifest weight of the evidence. In her third assignment of error, she argues that the evidence actually weighed in favor of granting her request for an extension.

Standard of Review

{¶23} "An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence." *In re M.J.*, 2013-Ohio-5440, ¶ 24 (8th

Dist.). The Supreme Court of Ohio clarified the manifest-review standard in parental rights cases in *In re Z.C.*, 2023-Ohio-4703, holding that when reviewing a court's award of permanent custody and termination of parental rights, "the proper appellate standards of review to apply . . . are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments that are presented by the parties." *Id.* at ¶ 18. Mother's second assignment of error challenges the termination of her parental rights under a manifest-weight standard.

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

*In re Z.C.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.

Analysis

{¶24} Revised Code 2151.414 sets forth specific findings a juvenile court must make before granting an agency's motion for permanent custody of a child. *In re C.F.*, 2007-Ohio-1104, ¶ 22. Specifically, there are two separate elements that must be established by clear and convincing evidence: (1) one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) must apply; and (2) granting permanent custody to an agency must be in the child's best interest. R.C. 2151.414(B)(1). Mother argues that the trial court's determinations regarding both

permeant custody elements were against the manifest weight of the evidence. We will review each element in turn.

**{¶25}** First, Mother argues that the trial court erred by determining that R.C. 2151.414(B)(1)(a) applied to this case. This statutory provision reads as follows:

> (B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
>
> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

**{¶26}** In determining whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents pursuant to R.C. 2151.414(B)(1)(a), the trial court is directed to consider the factors contained in R.C. 2151.414(E) alongside "all relevant evidence." Pursuant to R.C. 2151.414(E), "[i]f the court determines, by clear and convincing evidence . . . that one or more of [factors contained in R.C. 2151.414(E)] exist as to each of the

child's parents, the court *shall* enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. (Emphasis added.). Here, the trial court specifically listed R.C. 2151.414(E)(1) and (E)(16) as being established by the evidence. Further, the trial court's conclusions while discussing the findings under R.C. 2151.414(E) also seem to implicate R.C. 2151.414(E)(4). These statutory provisions read as follows.

> (E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
>
> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
>
> . . .
>
> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the

-12-

child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

. . .

(16) Any other factor the court considers relevant.

R.C. 2151.414(E).

{¶27} In its final entries, the trial court determined by clear and convincing evidence that the children "cannot be placed with the parents within a reasonable time, nor should the [children] be placed with the parents[.]" The trial court determined that despite the efforts of the Agency, the parents had failed to substantially remedy the conditions that led to removal. In addition, the trial court determined that Mother and Father had been "unable to provide for a safe, sanitary, hygienic, and safe [sic] environment for the [children], free from the threat of harm and/or risk factors from other individuals residing in the environment[.]" (*Id*.) The trial court specifically cited R.C. 2151.414(E)(1) and (E)(16) in its judgment entries.

{¶28} A review of the record supports the trial court's determinations related to the first prong of the permanent custody analysis. Despite Father not being employed and Mother being intermittently employed, the parents only exercised approximately one-third of their visitations with the children.[2] Even worse, after Mother and Father attended some of the visitations, the children again had head lice,

---

[2] Father was on social security disability. His health was in question during this case. At one point the evidence indicated that Father needed "around-the-clock care" from a caregiver, and Mother was his caregiver. (March 3, 2025, Tr. at 150). However, Mother did not have a driver's license.

which the children did not have going into the visitation. Agency caseworkers noted hygiene issues with the parents that continued throughout the case. It is not clear that the parents ever grasped the importance of hygiene.

{¶29} Moreover, the case plan required that Mother and Father provide names, dates of birth, and social security numbers of any individual living in the home so background checks could be conducted. During home visits, an Agency caseworker would often encounter unknown individuals staying in the residence. Mother and Father *repeatedly* showed terrible judgment throughout these cases by allowing sexual abusers, drug users, and people who had lost permanent custody of children into their home to stay. While Mother claimed at the final hearing that she understood that she needed to keep these types of people out of the home for the safety of the children, it was not a behavior she had actually displayed while the cases were pending. In fact, when she had recently rented a home, she rented with a woman who had lost permanent custody of her children.

{¶30} Undoubtedly the parents had made *some* progress during the pendency of these cases. They attended some counseling, though there were issues with that as well. The parents utilized case plan services such as food banks and "WOCAP" to assist with utilities and payment of rent. However, despite Mother's claims that the case plan goals were largely achieved, Mother and Father continuously showed a lack of true effort toward reunifying with the children, particularly through such things as failing to visit with the children. Further the parents housing issues

remained a problem. At one point Mother and Father were heating their home with the oven. At another point Mother and Father were living out of their car in Toledo. Father also spent some time in a psychiatric facility. For all of these reasons, we do not find that the trial court erred by finding that the first prong of the permanent custody test was met here.[3]

{¶31} With the first prong of the permanent custody analysis established, the trial court was required to proceed to the second prong—the best interests analysis under R.C. 2151.414(D)(1). This statutory subsection reads as follows:

> (D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months

---

[3] There are arguments by both parties regarding whether the "12 of 22" standard in R.C. 2151.414(B)(1)(d) was met with regard to the two older children. Any finding related to the "12 of 22" standard is redundant in this case, as only one finding needs to be present under R.C. 2151.414(B)(1) before the trial court must proceed to the best interests of the children. *See In re L.F.*, 2005-Ohio-3026, ¶ 32, fn. 3 (3d Dist.).

of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶32}** In reviewing the evidence presented related to the factors in R.C. 2151.414, with regard to factor (D)(1)(a) the evidence established that the children were bonded to their foster caregivers. The evidence established that there was some bond between the children and their parents as well, so there was some conflicting testimony on this issue. Nevertheless, the children had spent *significant portions* of their lives in the care and custody of children's services agencies in Kentucky and Ohio. In fact, since birth, M.S. has known no other placement than her foster caregivers.

**{¶33}** With regard to factor (D)(1)(b), the GAL recommended that the Agency's motions for permanent custody be granted.

**{¶34}** With regard to factors (D)(1)(c) and (d), again, the children had spent *significant* portions of their lives outside of the parents' custody. Despite having the children removed in Kentucky for poor home conditions, Mother and Father somehow found themselves in yet another "deplorable" living situation in Lima, Ohio. The children were in need of legally secure placement and there was no

indication that the parents were inclined to make rapid life changes such that they would be capable of caring for the children. By the time the final day of the final hearing arrived, the children had all been in the temporary custody of the Agency for over a year-and-a-half.

{¶35} Based on the evidence presented, the trial court determined that there were "continued concerns" with Mother and Father and their ability to safely parent the children. Throughout these cases the parents continued to display poor judgment and they treated the children's visitation more as an option than a necessity. The parents have not consistently displayed an awareness of environments that are acceptable for the children. In fact, while these cases were pending, a child of Mother's and a separate child of Father's were placed in the legal custody of other people.

{¶36} Based on the record before us, we do not find that the trial court lost its way by finding that the record clearly and convincingly supports granting the Agency's permanent custody motions. Simply put, after reviewing the record, we do not find that this is one of the exceptional cases where the evidence weighs heavily against the trial court's decision. *In re L.F.*, 2025-Ohio-3026, ¶ 45 (3d Dist.). Therefore, Mother's second assignment of error is overruled.

{¶37} Having determined that the trial court did not err in granting the Agency's motions for permanent custody, we similarly do not find that the trial court erred by denying Mother's requests for a six-month extension in her third

assignment of error. The trial court specifically addressed this and determined that the parents had "failed to successfully reduce the risk of harm to the child[ren]." The trial court determined that the children would not be reunified with either parent within the requested extension and we find no error with that statement given that the permanent custody awards were supported by the evidence. Therefore, Mother's third assignment of error is overruled.

*Father's First Assignment of Error*

{¶38} In Father's first assignment of error, he argues that the trial court erred by finding that the Agency engaged in reasonable efforts in these cases to support reunification.

Relevant Authority

{¶39} "[V]arious sections of the Revised Code refer to the agency's duty to make reasonable efforts to preserve or reunify the family unit," most notably R.C. 2151.419. *In re C.F.*, 2007-Ohio-1104, ¶ 29. Revised Code 2151.419(A)(1) requires a trial a trial court to determine whether a children's services agency "made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." However, this statute applies only at "adjudicatory, emergency, detention, and temporary-disposition hearings, and

dispositional hearings for abused, neglected, or dependent children[.]" *In re C.F.* at ¶ 41; *accord In re R.R.*, 2021-Ohio-1620, ¶ 78 (3d Dist.).

**{¶40}** Notably, the Supreme Court of Ohio concluded that "'[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414.'" *In re C.F.* at ¶ 41, quoting *In re A.C.*, 2004-Ohio-5531, ¶ 30 (12th Dist.). Nonetheless, "[t]his does not mean that the agency is relieved of the duty to make reasonable efforts" before seeking permanent custody. *Id.* at ¶ 42. "[If] the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* at ¶ 43.

**{¶41}** In *In re R.R.*, 2021-Ohio-1620, ¶ 79 (3d Dist.), this Court applied the Supreme Court of Ohio's holding in *In re C.F.* and determined that because the trial court previously made reasonable-efforts findings, an agency was not required to prove, nor was the trial court required to find, that the agency used reasonable efforts to reunify parents with their children before the trial court could grant permanent custody to the agency.

Analysis

**{¶42}** Although Father argues that the trial court erred by determining in its final judgment entry that the Agency engaged in reasonable efforts to support

-19-

reunification, the trial court had previously determined that the Agency engaged in reasonable efforts to reunify the family at multiple earlier points in this case.

{¶43} Generally, a children's services agency is required to demonstrate reasonable efforts prior to filing a permanent custody motion, not at the permanent custody hearing, *unless it has failed to do so previously. In re I.C.*, 2023-Ohio-4707, ¶ 58 (3d Dist.), citing *In re S.S.*, 2017-Ohio-2938, ¶ 166-169 (4th Dist.). "Because the trial court entered a reasonable efforts finding before placing the children in the agency's permanent custody," it was not required to do so again. *See id.*

{¶44} Notwithstanding the prior point, Mother and Father never explicitly challenged the Agency's efforts in this matter. Regardless, the record establishes *significant* efforts and engagement by the Agency in trying to assist the parents. There were numerous points where the Agency assisted in trying to help the parents clean up their residence. The parents were connected with services and visitation, utilizing them to some degree when they were not otherwise "busy."

{¶45} Importantly, when considering reasonable efforts, the issue is not whether there was anything more that the Agency could have done, but whether the case planning and efforts were reasonable and diligent under the circumstances of this case. *In re Leveck*, 2003-Ohio-1269, ¶ 10 (3d Dist.). There is no indication that there is anything more that the Agency could have done to assist Father in this matter that would have changed his outlook. Even the bed that had been provided by the Agency for one of the children was moldy after one year because the parents could

not keep hygienic practices. The dumpsters and all the cleaning product vouchers did not help in making the Holly Street home fit for the habitation of children. Any lack of effort falls on the parents, not the Agency.

{¶46} In sum, we find no error with the trial court's determination that the Agency engaged in reasonable efforts to support reunification in this matter. Therefore, Father's first assignment of error is overruled.

*Mother's First Assignment of Error*; *Mother's Fourth Assignment of Error*

{¶47} In Mother's first assignment of error, she argues that the trial court erred by failing to "enforce" R.C. 2151.281(D) and (I) regarding a GAL's duties in this matter. As Mother's trial counsel did not object to any purported deficiency with the GAL, we review the matter for plain error. Mother argues in the alternative that her counsel was ineffective for failing to object to the GAL's deficiencies.

Standard of Review

{¶48} A finding of plain error is "strictly limited," "extremely rare" and occurs only in "exceptional circumstances." *In re A.D.*, 2022-Ohio-736, ¶ 17 (12th Dist.). This is because the plain error doctrine implicates only those errors that are obvious and prejudicial and would have a material adverse impact on the proceedings. *In re M.G.*, 2023-Ohio-1316, ¶ 34 (12th Dist.); *In re B.R.*, 2025-Ohio-599, ¶ 13 (3d Dist.).

-21-

Analysis

**{¶49}** Mother contends that the GAL in this case did not comply with R.C. 2151.281(D) and (I) in this case. These statutory provisions read as follows.

> (D) The court shall require the guardian ad litem to faithfully discharge the guardian ad litem's duties and, upon the guardian ad litem's failure to faithfully discharge the guardian ad litem's duties, shall discharge the guardian ad litem and appoint another guardian ad litem. The court may fix the compensation for the service of the guardian ad litem, which compensation shall be paid from the treasury of the county, subject to rules adopted by the supreme court.
>
> . . .
>
> (I) The guardian ad litem for an alleged or adjudicated abused, neglected, or dependent child shall perform whatever functions are necessary to protect the best interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services provided the child by the public children services agency or private child placing agency that has temporary or permanent custody of the child, and shall file any motions and other court papers that are in the best interest of the child in accordance with rules adopted by the supreme court.
>
> The guardian ad litem shall be given notice of all hearings, administrative reviews, and other proceedings in the same manner as notice is given to parties to the action.

R.C. 2151.281.

**{¶50}** Mother contends first that the GAL did not file a report for the children until after the commencement of the final hearing on March 3, 2025. This is inaccurate. The GAL filed reports for the children prior to the final hearing, specifically on December 4, 2024. When the final hearing was continued, the GAL

-22-

was asked to update the reports and the GAL did, in fact, update the reports, filing them on March 25, 2025, multiple weeks before the final date of the final hearing.

**{¶51}** Next, Mother argues that the GAL reports contained "some of the same notes in the recommendation[s]" such as the home conditions not being remedied for the children. However, it is logical that some—or many—notes would overlap, particularly regarding home conditions, since the Agency was initially seeking to reunify the children with their parents in the parents' home.

**{¶52}** Mother next argues that the GAL had not "even talked to mother" thus the GAL should not have had concerns about her mental health. However the GAL was involved in these cases since nearly the inception, had reviewed records and had been present for the hearings. Moreover, Mother fails to mention the other concerns in the GAL's report such as the parents' non-compliance with parts of the case plan, a history of domestic violence between Mother and Father, and "unknown persons" in and out of the home.

**{¶53}** Mother seems to suggest that because the GAL did more work in some areas than others, the GAL was somehow deficient in this matter, but the record does not support these claims. While the GAL's report could have been more thorough, there is no indication that the GAL was derelict in her duties. For example, Mother contends that the GAL failed to properly express the wishes of the children in her report. However, the GAL ultimately recommended that the Agency's

motions be granted and Mother and Father never requested an *in camera* interview with the children. We find no error here, let alone plain error.

**{¶54}** Finally, any claims Mother makes in her brief that the GAL also violated "Superintendence Rule 48" are not well-taken as it has been repeatedly held that the rules of superintendence do not "create substantive rights." *E.g.*, *In re K.A.*, 2021-Ohio-1773, ¶ 49 (5th Dist.).

**{¶55}** For all of these reasons, we find that Mother has not demonstrated that the GAL failed to comply with R.C. 2151.281 or that the trial court erred by considering the GAL's reports in these matter.

**{¶56}** As Mother has demonstrated no error, we similarly do not find that trial counsel was ineffective for failing to object to the GAL's report. In permanent custody matters, we apply the same test for ineffective assistance of counsel as in criminal cases. *In re C.W.*, 2024-Ohio-3366, ¶ 24 (3d Dist.). In order to succeed on a claim of ineffective assistance of counsel, an appellant must "show that his trial counsel was deficient and that such deficiency prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 674, (1984). Here, we have found no deficiency, and even if we did find some deficiency, Mother has not established any prejudice. Thus she fails on both prongs of the ineffective assistance analysis. For all of these reasons, Mother's first and fourth assignments of error are overruled.

*Mother's Fifth Assignment of Error*

**{¶57}** In her fifth assignment of error, Mother argues that the trial court erred by denying the parents' request for a continuance on the first day of the permanent custody hearing.

Standard of Review

**{¶58}** The decision whether to grant a continuance is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *In re J.D.*, 2011-Ohio-1458, ¶ 44 (3d Dist.). An abuse of discretion connotes more than a mere error in law or judgment; it implies an arbitrary, unreasonable, or unconscionable attitude on the part of the trial court. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219 (1983).

Analysis

**{¶59}** At the outset we emphasize that the permanent custody hearing was originally scheduled to begin December 18, 2024. However, Mother filed to continue the hearing because she had "Respiratory Syncytial Virus." The trial court granted the request.

**{¶60}** On March 3, 2025, the newly scheduled date of the final hearing, Father's attorney requested a continuance due to Father's purported hospitalization. The trial court denied Father's request, discussing the issue at length in the final judgment entries.

> Prior to proceeding to Hearing on March 3, 2025, [Father's attorney] requested a continuance on behalf of the Father, due to his absence and alleged hospitalization. The Court inquired of counsel as to what, if any, documentation and contact they had been provided. The Court was provided with a copy of a Memorial Health letter, dated March 2, 2025, indicating that the Father . . . had been admitted to Memorial Hospital, in Marysville, Ohio, on March 1, 2025. . . . Further, the Father, according to the copy of the letter, was to be quarantined until March 8, 2025. The Court was provided with, presumably a screen shot of a patient room board, with the patient name of "Michael", but with no date indicated on the screen shot other than "3/ /25" [sic]. . . . The Court required counsel to attempt to contact the Mother and/or Father, in an effort to determine the status of their whereabouts. After approximately twenty (20) minutes, the Court was informed that the Father was, at that very same time, and rather suspiciously, checking himself out of the hospital and that the Mother was with him. This information was relayed by [Mother's attorney], after talking with the Mother and/or the Father on the phone. The Court notes that the Father failed to answer or return a phone call/text message from his attorney . . . and only responded to [Mother's attorney]. The Court then created a Zoom link for the Hearing, in order to allow the parents to appear through the use of video telecommunications technology. The parents then attended the Hearing through the use of the Zoom technology, and without objection.

The trial court continued its analysis noting that Father has requested multiple continuances previously for issues that did not directly conflict with court hearings.

**{¶61}** After reviewing the record, we find no abuse of discretion in this matter, particularly given that the parents were able to patriciate in the first day of the final hearing electronically. Parents were physically present for the second day of the final hearing when they testified, obviating any argument for prejudice.

**{¶62}** Given that the final hearing had already been continued previously and that Mother and Father were able to participate in the hearing remotely in the first

day of the hearing, we do not find that the trial court abused its discretion by denying the request for a continuance on the final day of the hearing. Therefore, Mother's fifth assignment of error is overruled.

*Father's Second Assignment of Error*

{¶63} In Father's second assignment of error, he argues that the trial court erred by permitting police reports to be introduced into evidence regarding incidents that occurred at Mother and Father's residence. He contends that the reports contained hearsay that was not otherwise admissible and that the reports violated his right to confront and cross-examine witnesses.

Standard of Review

{¶64} Generally, the admission of evidence lies within the broad discretion of the trial court. *State v. Conway*, 2006-Ohio-2815, ¶ 62. However, we conduct a de novo review of hearsay evidentiary rulings that implicate the confrontation clause. *State v. McKelton*, 2016-Ohio-5735, ¶ 97.

Analysis

{¶65} During the testimony of one of the Agency's caseworkers at the final hearing, the Agency sought to introduce evidence of numerous police reports from the Lima Police Department related to incidents involving Mother and Father and the people who were living in Mother and Father's residence while these cases were

pending. The reports/exhibits were certified by a records clerk, but no custodian of records appeared to testify at trial.

{¶66} Father objected to the introduction of the police reports arguing that even though the police reports were certified, there was no testimony from a records custodian and he had no ability to cross-examine the witnesses. The trial court overruled Father's objections to all but one of the exhibits, and admitted the police reports, "for the value the Court deemed appropriate, in consideration of the safety and well-being of the child[ren][.]" The exhibits consist of the following documents.

{¶67} Exhibit 8 is a report indicating that on January 2, 2024, officers responded to 750 Holly Street in Lima in reference to an alleged assault on a woman named Bonnie by Michael. Bonnie claimed that Michael got angry and kicked her. The report indicated that Bonnie was advised by police of how to press charges if she desired.

{¶68} Exhibit 9 is a report from July 2, 2024, wherein Michael reported "Bonnie" missing from the residence. She was later found at a local hospital.

{¶69} Exhibit 10 is a report from October 7, 2024, wherein officers responded to a fight in progress at Mother's residence. Officers spoke with Mother and Mother claimed that her and Father had allowed a woman named Brandie to stay at the residence for a few days. Brandie was using methamphetamine and told to leave by Mother and Father, but Brandie would not leave.

{¶70} Exhibits 11-15 were reports made to the Lima Police Department by Mother, Father, Jennifer S., Bonnie, and Kayla alleging that Edward P. had stolen items from them while he was living with them.

{¶71} Exhibit 16 is a report made by Kayla related to threats made by a man named George at a different residence altogether.

{¶72} Exhibit 18 involved an incident on August 26, 2024, wherein officers responded to an alleged incident of domestic violence between Mother, Father, and Kayla. Notably, Kayla was ultimately arrested as the aggressor.

{¶73} Exhibit 21 involved an incident that allegedly occurred December 18, 2024, wherein a woman named Ashley alleged she was sexually assaulted by Father. Mother was allegedly involved with holding the woman down to be assaulted. At the time of the final hearing, there were no charges filed related to this incident.

{¶74} In reviewing the police reports, it is evident that several of the exhibits have minimal relevance to this case and to these parents, which could be why the trial court indicated it would admit them only "for the value the Court deemed appropriate" and only inasmuch as they concerned the "safety and well-being of the child[ren]." Multiple reports related to thefts of minor items by the father of R.B. from various individuals add little-to-nothing to these cases. Exhibit 16 has only a tangential connection to Mother and Father. Thus beyond issues with hearsay, these documents have questionable relevance.

**{¶75}** However, we would emphasize that some of the information in the police reports was properly testified to in different contexts by Agency caseworkers at the final hearing, making the information in the police reports harmless. For example, there was separate testimony regarding Father's purported domestic violence and the issues with Kayla. Agency caseworkers also investigated the individuals staying in the residence, particularly since Mother and Father were not always forthcoming with information about the individuals.

**{¶76}** Nevertheless, Father is correct that generally, a police report constitutes inadmissible hearsay unless it meets one of the exceptions enumerated in the Rules of Evidence. *Amoako-Okyere v. United Methodist Church*, 2015-Ohio-3841, ¶ 50 (10th Dist.); *State v. McCaulley*, 2023-Ohio-1711, ¶ 32 (11th Dist.). However, Father's argument that that his rights under the Confrontation Clause were violated by the introduction of the police reports is not well-taken because the Confrontation Clause "is only applicable in criminal proceedings."[4] *In re R.R.*, 2021-Ohio-2369, ¶ 21 (5th Dist.); *In re Burchfield*, 51 Ohio App.3d 148, 154 (4th Dist. 1988); *In re Jones*, 1998 Ohio App.Lexis 6199 (3d Dist.).

**{¶77}** The Agency argues that the police reports were admissible under Evid.R. 803(6) and/or Evid.R. 803(8). These two subsections read as follows:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

---

[4] The Sixth Amendment begins "[i]n all criminal prosecutions . . .[.]"

. . .

(6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

. . .

(8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, unless offered by defendant, unless the sources of information or other circumstances indicate lack of trustworthiness.

{¶78} "To qualify for admission under Rule 803(6), a business record must manifest four essential elements: (i) the record must be one regularly recorded in a regularly conducted activity; (ii) it must have been entered by a person with knowledge of the act, event or condition; (iii) it must have been recorded at or near the time of the transaction; and (iv) a foundation must be laid by the 'custodian' of the record or by some 'other qualified witness.'" *State v. Davis*, 116 Ohio St. 3d 404, 2008-Ohio-2, ¶ 171. "Even after these elements are established, however, a business record may be excluded from evidence if 'the source of information or the

method or circumstances of preparation indicate lack of trustworthiness.'" *Id.*, quoting Evid.R. 803(6).

**{¶79}** Under Evid.R. 803(8) a police report is potentially admissible evidence and the statements are not hearsay if the observations in the report are the firsthand observations of the official making the report or the observations of a person with a duty to report to a public official. *State v. Gau*, 2002-Ohio-4216, ¶ 19 (11th Dist.), citing *Petti v. Perna*, 86 Ohio App.3d 508, 514 (3rd Dist.1993). "'All persons furnishing and recording information must be under an official duty to do so.'" *Gau* at ¶ 19, quoting *State v. York*, 115 Ohio App.3d 245, 248 (4th Dist.1996). "'If the supplier of information is not under a duty to do so, an essential link in Evid.R. 803(8)(b) is broken.'" *Id.* This rule does not embrace statements made by private citizens. *Gau*, citing *Cincinnati Ins. Co. v. Volkswagen of America, Inc.*, 41 Ohio App.3d 239, 242 (10th Dist.1987). A statement in a police report from a person who does not have a duty to make a report and acting as a private citizen is not admissible. *Id.* at ¶ 20. This is because it breaks an essential link in the analysis under Evid.R. 803(8)(b). *Id.*

**{¶80}** Based on the foregoing authority, undoubtedly some of the police reports contain hearsay that is inadmissible and prejudicial, particularly the reports related to domestic violence and sexual assault regarding Father. It is well-settled that declarations in a police report that do not stem from firsthand observations are not admissible. *Wicks v. Locer's Lane Mkt.*, 2022-Ohio-2652, ¶ 13 (9th Dist.).

Further, "Police reports admitted to prove the truth of the allegations they contain are inadmissible hearsay." *Id*.

{¶81} As many of the statements in the reports contained claims that were not firsthand observations by the officers, they would not be admissible. *Gau* at ¶ 20. However, this does not end our analysis. We have applied a "harmless error" analysis in the past to issues in juvenile court cases, and it is appropriate to do so here. *In re Franklin*, 2006-Ohio-4841, ¶ 16 (3d Dist.); *In re Davis*, 2000-Ohio-1761 (3d Dist.).

{¶82} In this case, the vast majority of the reports contain little or no damning information against Mother or Father. Nearly half of the reports are theft accusations against Edward P. A few of the reports contain some criminal allegations against Father, but the trial court was well aware that no criminal charges had resulted from the reports. In addition, much of the information was covered through examination of witnesses separate from the police reports, making the police reports merely cumulative to the evidence presented and thus harmless.

{¶83} Furthermore, the evidence outside of the police reports is overwhelming in support of granting the Agency permanent custody in this matter. The parents had continuously lived in "deplorable" conditions from Kentucky to Ohio, even if there were, at times, incremental improvements. The parents only exercised their supervised visitation with their children approximately one-third of the time. The parents *repeatedly* showed terrible judgment in the individuals they

allowed to access the home. Parents made numerous excuses for housing issues and timing issues that the trial court found not to be truthful or credible, and we can find no error with the trial court's finding. Thus we do not find that any errors here in admitting the police reports are anything other than harmless. For all of these reasons, Father's second assignment of error is overruled.

*Conclusion*

**{¶84}** Having found no errors prejudicial to Mother or Father in the particulars assigned and argued, their assignments of error are overruled and the judgments of the Allen County Common Pleas Court, Juvenile Division, are affirmed.

***Judgments Affirmed***

**ZIMMERMAN, P.J. and MILLER, J., concur.**

# JUDGMENT ENTRY

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgments of the trial court are affirmed with costs assessed to Appellants for which judgment is hereby rendered. The causes are hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

 

Juergen A. Waldick, Judge

 

William R. Zimmerman, Judge

 

Mark C. Miller, Judge

DATED:
/jlm